**ECONOMATION, INC., Plaintiff and Counterclaim Defendant,**

v.

**AUTOMATED CONVEYOR SYSTEMS, INC., Defendant and Counterclaim Plaintiff.**

**No. IP 85–1084–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 1, 1988.

Alan Lobley, Karen Love, Ice Miller Donadio & Ryan, Hugh E. Reynolds, Jr., Locke Reynolds Boyd & Weisell, Indianapolis, Ind., for plaintiff and counterclaim defendant.

Sydney L. Steele, Lowe Gray Steele & Hoffman, Indianapolis, Ind., Cecil W. Taylor, Martin Taylor & Perrow, Lynchburg, Va., for defendant and counterclaim plaintiff.

## ENTRY

TINDER, District Judge.

This matter comes before the court upon defendant's Motion for Revision of the court's Order and Entry on defendant's Motion for Summary Judgment and defendant's renewed Motion for Summary Judgment with respect to plaintiff's claim of tortious interference. The court being duly advised now GRANTS defendant's Motion for Revision and GRANTS Summary Judgment with respect to plaintiff's trade secrets claim and further GRANTS Summary Judgment with respect to plaintiff's claim for tortious interference with a business relationship.

### Background

In an entry of December 9, 1987, the court made certain findings of fact pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, which had the result of eliminating a substantial portion of plaintiff's claim for misappropriation of a trade secret. In the December 9, 1987, entry, the court found that "the record is silent as to whether two of the customers, St. Joe Container and Mid–Atlantic Packaging had re-

ceived price quotations from the plaintiff before Glass and Ryden joined the defendant's sales force." *Id.* at 11. Consequently, a question of fact existed as to whether Ryden left Economation's salesforce with price quotations not readily ascertainable from the customers.

In its Motion for Revision, the defendant maintains that the price quotations for St. Joe and Mid–Atlantic were given to the customers prior to Ryden's departure. Consequently, according to the defendant they were readily ascertainable within the meaning of that phrase in Indiana law;[1] thus, the price quotes were not cognizable trade secrets. On January 15, 1988, the court set this case for oral argument and agreed to reconsider defendant's Motion for Summary Judgment with respect to the plaintiff's theory of tortious interference with a business relationship, in conjunction with the rehearing on the remaining portion of the trade secrets claim.

### Discussion

Summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, is properly granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. Summary judgment must be entered against the nonmoving party if, after adequate time for discovery, the party "fails to make a showing sufficient to establish the exist-

ence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2553. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of non-moving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2553.

### I. Background

Plaintiff Economation, Inc., (Economation) and defendant Automated Conveyor Systems, Inc. (ACS) are competing manufacturers of conveyor systems. In May, 1985, another conveyor systems manufacturer, Pentek Corporation, acquired plaintiff. Prior to the acquisition, Pentek, Economation, and ACS were all active participants in the market; however, after the acquisition, only two companies remained to compete for sales in the industry. Pursuant to the acquisition, certain of plaintiff's salesmen were terminated, as of May 6, 1985. Two of these salesmen, Gordon Glass (Glass) and Russell Ryden (Ryden), became full-time salesmen for ACS as of July 1, 1985. In the interim period between their date of termination and the date of their employment as salesmen for ACS, Glass and Ryden represented ACS as independent contractors. During the period between May and July, 1985 and after joining defendant's sales force, Glass and Ryden sold conveyor systems manufactured by defendant to some of the same customers they had formerly called on as salesmen for plaintiff. Specifically, Glass had called on Bates Container Corp., Crockett Container Corp., Marfred Container Corp., Montebello Container Corp., and Stone Container Corp. on behalf of plaintiff, and after leaving plaintiff's sales force Glass finalized one or more sales to each of these customers on behalf of defendant. Similarly, Ryden had called on Connecticut Container Corp., Mid–Atlantic Packaging Corp., and St. Joe Container Corp., repre-

---

1. Neither party has contested the court's earlier determination that Indiana law controls this case. *See* Preliminary Injunction Conclusions of Law ¶ 2 (Entry dated April 23, 1986).

senting plaintiff, and later sold defendant's conveyor systems to the same customers.

Plaintiff claims the sales to these customers by Glass and Ryden were wrongful, and seeks damages from defendant on two theories; tortious interference by defendant with plaintiff's business relationship with Glass and Ryden; and misappropriation of plaintiff's trade secrets by defendant through Glass and Ryden.

### II. Trade Secrets

■ Indiana courts have established that in the sales context, once information is known to the customers, that information is readily ascertainable and is not a trade secret. *Prudential Ins. Co. v. Baker*, 499 N.E.2d 1152, 1154 n. 1 (Ind.App.1986); *Steenhoven v. College Life Ins. Co.*, 460 N.E.2d 973, 974 n. 1 (Ind.App.1984). The courts have determined that the information is readily ascertainable because once a customer has allegedly confidential information, the seller's competitor can obtain the relevant information from the customer. *Steenhoven*, 460 N.E.2d at 974 n. 1.

In its Supplemental Submission in Support of its Motion for Summary Judgment, the defendant tendered the deposition testimony of Russell Ryden of January 9, 1987, along with Exhibit 1 of that deposition. The exhibit was identified as a list of quotations which Economation provided to customers through Ryden in 1985. The third entry from the bottom of the second page of Exhibit 1 shows that a quote was submitted to St. Joe under quote number RR 85–03–006. The same document also shows a quotation to Mid–Atlantic under quote number RR 85–03–007.

The defendant also submitted the deposition testimony of Barry Weaver taken May 20, 1987. Mr. Weaver testified that "very specific pricing information in the form of actual quotations" was submitted to Mid–Atlantic. (Weaver Deposition, May 20, 1987, pp. 199–200). Further, plaintiff herein admits that the price quotation information was provided to the customers prior to Ryden's departure. Therefore, the information was readily ascertainable within the meaning of that phrase for purposes of the Indiana Trade Secrets Act. The price quotations are not cognizable trade secrets and are not entitled to the protection afforded by the Act. There remains no genuine issue of material fact with respect to the plaintiff's trade secrets claim. Consequently, the court hereby GRANTS defendant's Motion for Summary Judgment with respect to that claim.

### III. Tortious Interference with a Business Relationship

In its Motion for Summary Judgment, ACS maintains that Economation has failed to produce sufficient evidence to satisfy its burden with respect to its claim for tortious interference with a business relationship. Economation maintains that Glass and Ryden breached a fiduciary duty owed to Economation to maintain the confidentiality of customers' information acquired during the term of their employment at Economation. Plaintiff argues that Glass and Ryden are prohibited from completing sales to customers with whom they negotiated on behalf of Economation. Further, the plaintiff maintains that ACS' employment of Glass and Ryden and its payment of a commission on the sales to the customers with whom Glass and Ryden had contact prior to their termination constitutes tortious interference with a business relationship or prospective advantage.

■ The five elements which the plaintiff must prove in order to sustain its burden of proof with respect to its claim for tortious interference are:

1. that a valid business relationship exists;

2. of which the defendant knew;

3. in which the defendant tortiously interfered;

4. without justification; and

5. that damage resulted to the plaintiff.

*Flintridge Station Assoc. v. Am. Fletcher Mtg. Co.*, 761 F.2d 434, 440 (7th Cir.1985) (citations omitted). Indiana permits recovery for tortious interference with a business relationship even in the absence of a contract. However, in such cases "it is critical that the defendant acted illegally in

achieving his end." *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 542 (7th Cir.1986); *Spier v. Home Ins. Co.*, 404 F.2d 896, 898 (7th Cir.1968); *Johnson v. Hickman*, 507 N.E.2d 1014, 1019 (Ind. App.1987); *Biggs v. Marsh*, 446 N.E.2d 977, 983 (Ind.App.1983). Therefore, in considering whether the plaintiff has met its burden in this case, the court must consider whether any conduct which is found to interfere with a prospective business advantage is sufficiently "wrongful" to satisfy the illegality requirement.

### A. The Existence of a Valid Business Relationship

Plaintiff asserts that the source of the valid business relationship between Economation and its former employees, Glass and Ryden is found in the general principle of agency law that every agent owes a fiduciary duty to his principal to refrain from interfering with the principal's ability to accomplish the purpose of the agency. One of the earliest court interpretations of the fiduciary duty in the employment setting is found in *Trice v. Comstock*, 121 F. 620 (8th Cir.1903). The *Trice* court stated:

> the law peremptorily forbids every one who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation.

*Id.* at 622.

That is, the law imposes a duty upon an agent to use the knowledge and the benefits of his agency to accomplish the purpose of the principal and it implies an agreement on the part of the agent that he will faithfully discharge his duty. *Id.* at 624.

Although the language in *Trice* is subject to broad interpretation, the principle arising out of the case has been narrowly applied. The duty of an employee to a former employer has been balanced against the right of the former agent to compete with his former principal. Case law following *Trice* has developed restrictions and limitations inherent in the statement of the duty, seemingly intended to ensure an open and competitive marketplace. In *Potts v. Review Bd. of Ind. Emp. Sec. Div.*, 475 N.E.2d 708 (Ind.App.1985), the court recognized that its obligation was to "balance the concern for the 'integrity of the employment relationship' against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty." *Id.* at 712. Thus, the task before this court becomes one of examining the fiduciary duty of an employee to his former employer to determine whether it extends to include the transactions at issue in this case and functions to prohibit Glass and Ryden from completing those sales on behalf of the defendant, ACS.

In *Prudential Ins. Co. v. Crouch*, 606 F.Supp. 464 (S.D.Ind.1985), *aff'd*, 796 F.2d 477 (7th Cir.1986), Judge Dillin explained the application of the *Trice* principle as follows:

> [t]he continuing duty described in *Trice* does not abrogate the right to compete, even 'steal' clients following termination of employment (citation omitted). Rather, the rule in *Trice* is applied only to prohibit an employee from completing transactions, which the employee negotiated during his employment, for his own benefit following termination of the employment.

*Id.* at 471 (*citing, Group Ass'n. Plans, Inc. v. Coloquhoun*, 466 F.2d 469, 474 (D.C.Cir. 1972)). Judge Dillin also noted that "this application of the rule in *Trice* is consistent with the law in Indiana." *Id.*

In *Prudential Ins. Co. v. Diemer*, 637 F.Supp. 313 (N.D.Ind.1986), *aff'd*, 810 F.2d 1167 (7th Cir.1987), the court further explained the application of the *Trice* principle in Indiana. The *Diemer* court said:

> The fiduciary duty which Diemer owed to Prudential only prohibits him "from *negotiating* any sale (either original or renewal) of a life insurance policy *during* his *employment* with Prudential and then *completing* the sale *after* his *resignation....*"

*Id.* at 317 (*quoting, Crouch*, 606 F.Supp. at 471) (emphasis in original).

The case of *Group Assoc. Plans, Inc. v. Colquhoun,* 466 F.2d 469 (D.C.Cir.1972) is also instructive on the issue of when the employee's fiduciary obligation prohibits him from completing, for his own benefit, a transaction he negotiated for a previous employer. The *Colquhoun* court noted that the essential fact is that the negotiations prior to the employee's termination and consummation thereafter, constitute a continuous transaction. *Id.* at 473 (citation omitted). That is "what is important is what might be characterized as an incomplete transaction, which the employee appropriates to his own benefit." *Id.* at 474.

In each of the above-cited cases where the fiduciary obligation was found to prohibit an employee from completing a transaction for his own benefit and for the benefit of a new employer, the transactions at issue were negotiated while the employee was employed by the former employer and were completed after the employment was terminated. At first glance, the transactions at issue in this case seem to fall within the parameters of the fiduciary duty prohibiting Glass and Ryden from completing sales for ACS which they began negotiating at Economation. However, more careful examination of the sales at issue in this case suggests that they had not progressed to the point of falling within the protection afforded by the fiduciary duty.

As Judge Dillin noted in *Crouch,* the continuing duty in *Trice* only prohibits the completion of a sale negotiated prior to the termination of employment. Thus, the question becomes one of determining whether the transactions at issue in this case had reached the point that they could be characterized as the "fruits" of the employment relationship between Economation and its salesmen, Glass and Ryden.

The case law which has defined the limits of the fiduciary duty has substantially narrowed the broad principle established in *Trice.* In nearly every case where the fiduciary duty is triggered prohibiting the completion of a transaction by a former employee, the courts focus on the employee's use of "information and advantages he secured by means of his agency to prevent or hinder his principals from accomplishing the purpose of the agency." *Group Association Plans, Inc. v. Colquhoun,* 466 F.2d 469, 473 (D.D.C.1972) (citing, *Trice v. Comstock,* 121 F. 620, 625–26 (8th Cir.1903)). That is, the courts focus on the employee's use of confidential information acquired in the course of his agency to interfere with the principals' ability to attain the objective of the agency.

In *Brown & Root, Inc. v. La Bauve,* 219 F.Supp. 179 (W.D.La.1962), *aff'd,* 319 F.2d 582 (5th Cir.1963), the court addressed a situation where the defendant, as the right of way agent for the plaintiff, had obtained complete knowledge of the project which would not otherwise have been available to him. The court granted a preliminary injunction prohibiting the defendant from purchasing the land along the pipeline route in order to obtain the right to resell the land to the plaintiff. The *Brown & Root* court said:

> [t]o permit defendant to now capitalize on the information and knowledge he had gained while in the employ of plaintiff at a time when the end product of his employment comes into fruition, is repugnant to the nature of the engagement entered into by him with his employer. The fiduciary relationship continues even after termination of the employment, in much the same manner as does the relationship between attorney and client, doctor and patient, agent and principal.

*Id.* at 180.

*Byrne v. Barrett,* 268 N.Y. 199, 197 N.E. 217 (1935), is also instructive on the issue of when the duty of an employee to his employer concerning information acquired during the course of the employment is triggered and what the duty requires of the employee.

> The essential point to be borne in mind is that the duty on an agent or employee not to use confidential knowledge acquired in his employment in competition with his principal is implicit in the relation. (citations omitted). It exists as well after the employment is terminated as during its continuance. It is an absolute and not a relative duty. *The ques-*

*tion then is whether the defendant's knowledge of the status and details of the negotiations is to be considered a confidential matter or merely a matter of general business knowledge and experience of competitive conditions gained from his calling.*

197 N.E. at 218 (emphasis added).

■ The evidence concerning the transactions at issue in this case suggests that they could not be characterized as a continuous transaction. On the contrary, the fifteen contracts at issue in this case were consummated at various times after Glass and Ryden were terminated by Economation. Further, nothing in the record indicates that the contracts at issue had been negotiated to the point of completion when Glass and Ryden were terminated.

Negotiations for sales of conveyor systems for the corrugated box industry are extended according to the evidence presented herein. Salesmen and customers work together to ensure a match between the system and the customer's needs. The transactions were characterized as major capital investments which typically require a substantial period of negotiation for the purpose of gathering necessary customer information and designing and revising a conveyor system. The particular needs of the customer dominate the transaction, and a sale can be consummated only after months, and sometimes years, of intense dealing with the peculiarities of a particular plant, location, manufacturing or packaging process, or industry.

The contracts at issue in this case had progressed to different stages of the negotiation process and the record reflects that none of them were ready for completion at the time that Glass and Ryden were released by Economation. As such, the sales at issue herein do not logically fall within the narrow protection of the fiduciary duty as it has developed. As Judge Dillin noted in *Crouch,* the continuing duty expounded in *Trice* only prohibits an employee from completing transactions after termination of the employment which the employee negotiated during his employment. 606 F.Supp. at 471. The term "negotiated" in

this instance is properly considered the equivalent of finalized, in light of the stated purpose of balancing the duty of the employee to his former employer against the employee's common-law right to compete. That is, the duty only extends to prevent an employee from appropriating firm agreements away from his former employer. Where, as here, the contracts have not reached the point of completion, the desire to maintain an open and competitive marketplace prevails and the employee is not foreclosed from pursuing the sale.

The decision that there is no recognizable business relationship between Economation and Glass and Ryden is strengthened when it is considered in light of the fact that Economation, through its parent Pentek, could have competed for the contracts. There is no dispute in the record that Economation was aware of the contact between its employees Glass and Ryden and the companies which eventually purchased the conveyor systems herein. The evidence in this case also suggests that Pentek, the company which acquired Economation, had a salesforce which could have, and in some cases was, engaged in submitting competitive bids on these projects.

Additionally, the decision that the continuing fiduciary duty of an employee to a former employer did not prohibit Glass and Ryden from representing ACS in these transactions is bolstered by the fact that Economation terminated Glass and Ryden's employment. The cases which have construed the fiduciary duty have generally arisen in the context of an employee resigning from his employment and taking business with him. Glass and Ryden were long-time salesmen of conveyor systems and the practical effect of a requirement that they not negotiate and finalize the deals at issue in this case would be to prohibit these salesmen from earning a living. While it may be true that Glass and Ryden had "superior" knowledge of the potential sales to their customers it was not exclusive knowledge. Economation was aware of the prospective sales and it could have competed for the contracts through its parent, Pentek. In addition, to the ex-

tent that Glass and Ryden's knowledge was superior to Economation's knowledge of the transactions, it was the result of the salesmen's experience, expertise and hard work. To order that the salesmen are required to forego the benefits of their efforts, when the record reflects that they informed Economation of the prospective sales prior to their termination, would be wholly inconsistent with the narrow interpretation given the *Trice* duty.

Counsel for the plaintiff read the *Trice* line of cases too broadly. Given the underlying basis in Indiana law favoring competition, the restrictions on former employees must be narrowly drawn. The severe limitations advanced by the plaintiff in the context of the conveyor systems industry, would necessarily deprive the salesmen of their livelihood. In addition, the strict construction of the fiduciary duty principle advanced by the plaintiff herein creates an even larger problem in this market, where there are only two participants. Economation's version of the fiduciary obligation herein would prohibit ACS from dealing with any customers with whom Glass and Ryden negotiated during the period of their employment. Further, plaintiff's definition of "negotiation" encompasses deals at every stage of the selling process. The result of this construction of the duty is that the purchaser is foreclosed from seeking and obtaining a competitive bid from the only other participant in the industry. Plaintiff's broad construction of the *Trice* principle effectively creates an environment where by nature of the fact that Economation terminated its employees, it essentially becomes a monopoly participant in the conveyor systems industry. Perhaps a comprehensive restriction could have been negotiated and bargained, but in the absence of an agreement, the law will not impose such a restriction, especially where, as here, the restriction would have the effect of sanctioning a monopoly.

The evidence in this case simply does not indicate that the contracts at issue had advanced to a point that they would fall within the protection afforded by the fiduciary duty of a former employee to his former employer. The narrowly-defined duty is balanced against the common-law right of the employee to compete with his former employer. Therefore, the duty would appear only to prohibit the salesmen from appropriating consummated deals or deals which were just at the point of consummation away from their employers. Contracts at issue were subject to modification and revision between the termination date of May 6, 1985, and the actual date that the sales were finalized. None of the transactions at issue in this case can properly be considered "negotiated" transactions within the meaning of that phrase for purposes of triggering the fiduciary prohibition which the plaintiff asserts. Plaintiff has not sustained its burden with respect to proof of the existence of a valid business relationship, the fiduciary duty does not and should not extend to encompass the contracts in this case, where the practical effect of the expansion of the duty to this situation would result in substantial restrictions on competition.

### B. Defendant's Tortious Interference in the Relationship

■ Even if the fiduciary duty was found to extend to cover the situation at issue in this case, the plaintiff would still fall short of sustaining its burden on its tortious interference claim. Plaintiff maintains that "ACS induced Gordon Glass and Russell Ryden to breach ... [their] duty by promising to pay and paying commissions to Gordon Glass and Russell Ryden on these projects." *Brief In Opposition to Defendant's Motion for Summary Judgment* p. 16. The evidence herein shows that Economation terminated Glass and Ryden on May 6, 1985, and established a deadline for receiving commissions for sales completed of May 9, 1985. From the date of their termination to July 1, 1985, Glass and Ryden attempted to sell conveyor equipment as independent contractors, representing product lines for ACS and other companies. On July 1, 1985, Glass and Ryden accepted full-time employment as salesmen for ACS. Plaintiff maintains that the sales made by Glass at Bates Container Corp., Crockett Container Corp., Marfred

Container Corp., Montebello Container Corp. and Stone Container Corp., on behalf of ACS were prohibited. Those sales were finalized over almost a two-year period between May 20, 1985, and April 3, 1987. It should be noted that several of the projects which the plaintiff asserts that Glass was prohibited from negotiating were not single transactions. Rather, the projects at Crockett Container, Marfred Container, Montebello Container and Stone Container were, in reality, two, three or four separate orders over a period of one to two year time periods. Similarly, plaintiff asserts that Ryden represented Economation at St. Joe Container, Mid–Atlantic Packaging and Connecticut Container prior to May 6, 1985, the date of his termination, and that sales were made to those companies by Ryden on behalf of ACS after May, 1985, and before the end of January, 1986.

Plaintiff alleges that ACS' conduct of hiring Glass and Ryden and paying their commissions on these fifteen projects at issue was an inducement to breach their fiduciary duty to Economation. Plaintiff maintains that the conduct on the part of ACS inducing a breach of the salesmen's fiduciary duty constitutes constructive fraud sufficient to satisfy the illegality requirement which is a prerequisite for finding liability in a claim for tortious interference with a business relationship. However, the plaintiff has presented no independent evidence of inducement on the part of ACS. After they were fired, Glass and Ryden contacted ACS and discussed the opportunity of securing employment with the company, the only other participant in the market where they were skilled and knowledgeable salesmen. Glass and Ryden, two highly-qualified salesmen in a customer-sensitive industry, approached a representative from the only other game in town in an effort to find a job after their employment was terminated by Economation. In this instance, there is simply no indication that Glass and Ryden made any attempt to acquire the business at issue herein for ACS prior to their termination. Therefore, this case is easily distinguished from the cases where an employee appropriates business away from his current employer for the benefit of a new employer.

Plaintiff has done no more than make the bare assertion that hiring qualified salesmen and permitting those salesmen to sell ACS' products was inducement to breach a fiduciary duty. It is difficult to understand how such conduct can properly be characterized as inducement, especially in light of the preference for competition demonstrated by the narrow interpretation given to the fiduciary duty of a former employee to his former employer. ACS did no more than hire qualified individuals to sell conveyor systems. The fact that Glass and Ryden may have garnered some information about the projects prior to the time that they were terminated by Economation is insufficient to impose the severe prohibition on competition which the plaintiff seeks. As the court previously noted, the fiduciary duty of an employee to a former employer simply does not logically extend to the contracts at issue in this case, where the two-fold practical effect of the extension would be to foreclose two experienced salesmen from recognizing the fruits of their labor for a two-year period and to sanction a monopoly by prohibiting competition from the only other active participant in the market. Similarly, the conduct of hiring qualified individuals who through their own efforts have generated potential sales and compensating those individuals for their efforts through the payment of their commissions can not properly be characterized as illegal conduct sufficient to support a claim for tortious interference with a business relationship. In the case of *Great Escape, Inc. v. Union City Body Co., Inc.,* 791 F.2d 532 (7th Cir.1986), the Seventh Circuit Court of Appeals commented on the illegality requirement of a tortious interference claim as follows:

"[w]e think these limitations by various authorities on the tort of interference with prospective business relations are appropriate. Competitors and their allies are not necessarily gentlemen—or even scholars. Competition may be rough and tumble and even—within reasonable bounds—involve economic factors—extraneous to the main competition itself.

We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still under the Indiana cases be something 'illegal' about the means employed. *Here the means used, no matter how viewed or how characterized, do not rise to the required level of wrongfulness.*

*Id.* at 533 (emphasis added).

In this case, it is difficult, if not impossible, to characterize the defendant's innocuous conduct of hiring qualified salesmen and competing for available business as "wrongful," especially in light of the court's finding that the duty does not expand to cover this case. Indiana courts undeniably favor an open and competitive marketplace. ACS' conduct in this case was wholly consistent with those principles of competition. The actions of hiring qualified salesmen to sell your product and paying commissions on sales which were the result of the experience, expertise and hard work of those salesmen is not "wrongful" conduct sufficient to support a finding of tortious interference with a business relationship.

### C. Without Justification/Disinterested Malevolence

Finally, even if ACS' conduct can be characterized as tortious interference, plaintiff must establish that the interference was unjustified in order to recover. In *Flintridge Station Assoc. v. American Fletcher Mtg. Co.*, 761 F.2d 434 (7th Cir. 1985), the Seventh Circuit Court of Appeals addressed the issue of what is required to establish that a defendant's conduct which has been characterized as interference is "without justification" and thus, tortious. The *Flintridge* court stated:

[a]lthough few courts have dealt in depth with the meaning of the term "unjustified," in the sense that it is used here, one court has defined unjustified as a "disinterested malevolence." *Reinforce, Inc. v. Birney*, 308 N.Y. 164, 124 N.E.2d 104, 106 (1954). *Birney* further defined the predicate conduct in terms of a "mali-

cious one unmixed with any other and exclusively directed to injury and damage of another."

*Id.* at 441.

The *Flintridge* court further noted that "what *Birney* essentially holds is that *the existence of a legitimate reason for the defendants' actions will provide the necessary justification to preclude judgment for the plaintiff in the tort action.*" *Id.* (emphasis added).

In this instance, the justification for the defendant's conduct was competition. ACS was the only other participant in the conveyor system market for the corrugated box industry. The decision to permit Glass and Ryden to sell ACS products in the period between May 6, 1985, and July 1, 1985, along with the decision to hire Glass and Ryden as permanent salesmen were decisions designed ultimately to obtain sales in a competitive market. There is a limited market for the products of both Economation and ACS. Consequently, it is natural that the two companies would be competing for the same business and submitting bids to the same customers. Case law in the area of limiting competition has developed very narrowly and there is a general preference for ensuring that the market place remains open and competitive. To prohibit Glass, Ryden, and ACS from competing for the sales at issue in this case would be to sanction a monopoly in this industry. ACS' motive in this case was competition, the desire to make a sale. That motivation is clearly recognized as a legitimate reason for defendant's conduct. Therefore, even if the *Trice* duty is interpreted broadly enough to encompass this situation creating a valid business relationship and even if defendant's actions of hiring Glass and Ryden and paying them commissions on the projects at issue in this case can properly be characterized as tortious interference, the fact that the defendant's actions were motivated by the legitimate purpose of competing for sales would make the interference justified and that justification would defeat a finding of tort

liability.[2]

In this instance, the court has determined that the plaintiff has failed to sustain its burden on three of the five elements of its tortious interference claim, namely the existence of a valid business relationship, in which the defendant tortiously interfered, without justification. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), the Supreme Court firmly established that where, as here, a party has failed to establish elements of its claim upon which that party will bear the burden at trial summary judgment is mandated. There exists no genuine issue of material fact with respect to plaintiff's claim for tortious interference with a business relationship. Therefore, the court GRANTS defendant's Motion for Summary Judgment as to that claim.

---

**2.** Because the court found that no valid business relationship existed between Economation and Glass and Ryden and because the court found that ACS did not tortiously interfere in a relationship if it was found to exist or in the alternative that any interference was justified, the court does not reach the issue of whether ACS was aware of any existing relationship or whether plaintiff was damaged by defendant's tortious conduct.